Leo JOHNSON, Plaintiff,

v.

MEMPHIS POLICE DEPARTMENT, Defendant.

No. 87–2535–4B.

United States District Court, W.D. Tennessee, W.D.

March 20, 1989.

Richard B. Fields, Memphis, Tenn., for plaintiff.

Louis P. Britt, III, Memphis, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McRAE, Senior District Judge.

This is a civil action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in which the plaintiff seeks relief for his wrongful termination based upon race discrimination. Jurisdiction of the Court is properly invoked.

After hearing and considering the pleadings, testimony, and exhibits, the Court makes the following findings of fact and conclusions of law.

### *Findings of Fact*

Plaintiff Leo Johnson, a black citizen of Tennessee, was employed as a commissioned police officer by the Police Department of Memphis, Tennessee, in 1975. After completing his training, he was assigned uniform patrol duties in the East Precinct. He remained in uniform patrol until March 27, 1979, at which time he informed his commander that he had been diagnosed with "uncontrollable folliculitis," a facial hair condition common to black males that did not permit him to shave. Therefore he requested to grow a beard.[1]

The Memphis Police Department, by regulation had required all uniformed police officers to be clean shaven, with the exception of neatly groomed mustaches. Some employees of the Police Department in non-uniformed positions were allowed to grow beards for non-medical reasons. The plaintiff furnished medical confirmation of his need to grow a beard. Ltr. of A.R. Flowers, M.D., March 22, 1979. Tr. Ex. 10. Due to his medical condition, he was transferred to I.S.D. Administrative Control effective March 31, 1979, by Chief Inspector J.G. Ray. Tr. Ex. 7. Subsequently, plaintiff held non-uniform commissioned officer positions at the East Precinct, Vice Squad, Communications Section, and the Crime Stoppers Bureau.

By letter dated February 1, 1985, John D. Holt, Director of Police Services, advised plaintiff that he had been found eligible to compete for advancement to the rank of lieutenant but his name had been withdrawn as a candidate due to his inability to meet the uniform standards since he was unable to shave. Tr. Ex. 1. By letter dated February 4, 1985, plaintiff advised Director Holt that he wished to appeal the decision to remove plaintiff's name from the candidates for promotion to the rank of lieutenant. Tr. Ex. 2.

After a meeting on February 7, 1985, Director Holt and the plaintiff on February 8, 1985, executed an Agreement Between the City of Memphis Police Department and Officer Lee Johnson, Tr. Ex. 8. That agreement provided:

1. Plaintiff would be permitted to compete in the lieutenant promotional process for 1985.

---

1. R. Bartholomew Gibbs, M.D., on January 4, 1986, described folliculitis and recommended to plaintiff as follows:

   [It] is a chronic reactive skin condition of the beard area. It is very common in Blacks. It is characterized by the curving of beard hair back into its original follicle(s) or penetrating of adjacent skin. This often results in an inflammatory reaction consisting of tenderness, redness, swelling and occasional secondary pustular infections. These lesions often require repeated treatments with antibiotics, soaks and special creams. The lesions may heal with disfiguring hyperpigmentation, cyst, scar or keloid formation. The condition is aggravated by any form of shaving. The reactive nature of the skin remains present for life.

   My treatment recommendation, as I have discussed with the patient, is not to shave for the best possible control. Neat trimming of his beard and mustache are not contraindicated, as this may be necessary in keeping with his professional position. Tr. Ex. 3.

2. Plaintiff agreed to take whatever steps were necessary to conform to the Police Department dress and appearance standards.

3. If plaintiff was not successful in his promotional efforts, he would be permitted to remain in his assignment at the time until it was deemed "necessary and/or advisable" for him to be reassigned.

4. If and when the Department officials reassigned him, he would "take whatever steps necessary to conform to the dress and appearance standards" or he would have his commission revoked.

5. It was agreed that the failure of the plaintiff to conform to the dress and appearance standards was due to medical conditions existing at that time.

Plaintiff was not selected for promotion. Therefore he remained in the Crime Stoppers Bureau. In the fall of 1985, the plaintiff was notified that he and other commissioned officers assigned to Crime Stoppers and elsewhere would have to transfer to uniform positions pursuant to a partial reorganization of the Department. In the process, those required to transfer would be allowed to bid on available positions in the uniform divisions. The plaintiff advised that he could not bid for a position in the uniform division because he could not comply with the Department policy which required that he not have a beard. Plaintiff did not bid when the process was first offered. When it was noticed that plaintiff had not bid in the first round, he was called to a meeting with Deputy Chief J.E. Ivy and other Department officials where it was noted that there were three positions still available after the first round of bidding, but plaintiff still refused to bid. Tr. Ex. 15. Minutes of Meeting held October 23, 1985, signed by three Department officials. The minutes reflect that plaintiff was asked when he had gotten his most recent statement from his doctor and that he had replied two years previously. The minutes contain what appears to be a contrived statement adverse to the plaintiff as follows:

Officer Johnson was told of how the Department had done everything possible to accommodate him from the time his problem was identified, but he had shown little concern by not getting updated doctor's reports with any more frequency than he had. Tr. Ex. 15.

Not only is there no evidence of requests for medical up-dates by the Department, but also, the contract relied upon by Chief Ivy is the basis for terminating him because he failed to live up to its terms, contains a specific provision that plaintiff was unable to shave due to medical conditions existing on February 8, 1985, approximately nine months before his termination. Tr. Ex. 8.

Those minutes also include a paragraph with an ambiguous unspecific reference to the provisions of the agreement of February 18, 1985, which ends with the even more ambiguous sentence: "Officer Johnson admitted to being familiar with how the agreement reads, however, he informed us of having no intention to abide by the agreement." As previously indicated in this ruling, the Agreement was prepared primarily to permit the plaintiff to compete for a promotion to the position of lieutenant subject to the condition that he would not be allowed to serve as a lieutenant if he were chosen after the competition without "taking whatever steps necessary to conform to the Memphis Police Department's dress and appearance." This did not mean that he would be required to shave at great pain. If he could meet the standards otherwise, such as by electrolysis (which later proved not to be feasible) or obtaining a waiver of the no-beard policy, he would have been in compliance. Trial Exhibit 16 is a set of minutes for a meeting on October 24, 1985, attended by three deputy chiefs and the plaintiff in Chief Ivy's office. The minutes reflect that the plaintiff declined to bid on one of the two available uniform positions and the alternate option of resigning his commission and seeking a civilian position in the Police Department or another department of the city government.

If he had resigned his commission and accepted civilian employment, he would have received the same pay. However, he

would have lost certain benefits which in the opinion of this Court justified his refusal to accept a wrongful order to resign his commission and accept a civilian job or bid for a job and then be terminated for failure to shave.

As a consequence of his refusal to bid on a job, he was suspended and told to be available for signing administrative charges against him.

Trial Exhibit 16 also reflects that on October 25, 1985, administrative charges were drawn against plaintiff for Insubordination and Disobedience to an Order. Later he was also charged with being A.W.O.L. because he could not be located in Memphis the weekend after he was suspended in order for the administrative termination charges to be served on him.

By letter dated November 6, 1985, Deputy Chief Ivy notified the plaintiff that he was terminated from the Police Department effective Monday, November 4, 1985. The letter reviews the plaintiff's conduct, agreements and refusal to accept the options offered from the viewpoint most favorable to the Department. In doing so, it shows bias against the plaintiff and is sometimes erroneous. Tr. Ex. 3.

The plaintiff appealed to the city's Civil Service Commission. His termination for Insubordination, Disobedience to an Order, and A.W.O.L. was affirmed, but race discrimination was not considered by the Commission.

After plaintiff was terminated, a white police officer, P–2 Nichols, was transferred to the Crime Stoppers Bureau on October 10, 1986, in spite of the budgetary directive that precluded the Police Department from placing P–2's, including plaintiff, in that Bureau. Tr. Ex. 6. Officer Nichols had served with plaintiff in the Crime Stoppers Bureau.

On October 25, 1988, counsel for the defendant made an unconditional offer to reemploy plaintiff as a commissioned police officer with the Memphis Police Depart-

ment in a non-uniform status. Tr. Ex. 14. Mr. Johnson immediately accepted the unconditional offer and was reinstated as a commissioned police officer on November 14, 1988. He retained his original seniority, but he was not credited for time during his break in service from November 4, 1985, to November 14, 1988, nor did he receive any backpay. He was assigned to the Vehicle Impound Bureau.

Counsel for the plaintiff asserts that actionable discrimination has been established under the disparate impact theory, which relieves a claimant from proving that the discrimination was intentional. Counsel for the defendant argues that the disparate impact theory as enunciated in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), was not applicable to the case because the facially neutral policy did not operate to exclude a disproportionate number of minority persons.[2] In support, the defendant says the plaintiff is the only police officer who claimed harm from the no-beard policy for commissioned officers. However, Negroes as commissioned officers in Memphis, Tennessee, are relatively new in this century, and there is no way of determining how many, if any, black officers failed to apply or left the Department because they had folliculitis. In *E.E.O.C. v. Trailways, Inc.*, 530 F.Supp. 54, 56 (D.Colo.1981), the court noted that folliculitis is a "disease unique or almost unique to blacks," that the only known cure is abstinence from shaving and that it lasts for a lifetime. The court held that the employer could maintain a no-beard policy if he accommodated a victim of folliculitis upon being furnished a medical certificate. See also *Richardson v. Quik Trip Corp.*, 591 F.Supp. 1151, 1155 (S.D.Ia.1984).

However, the manner in which the plaintiff was manipulated into an unfair choice of staying with the Department preponderates in favor of a finding that he was intentionally discriminated against by

---

**2.** In *Griggs v. Duke Power Co.*, the court used the term "facially neutral" to describe an employer policy or regulation which was neutral on its face without regard to race, gender, etc.

That term is to be distinguished from the plaintiff's contention wherein the "no beard" policy of the Police Department was not neutral in its effect on the faces of black males.

terminating him because he refused to shave even though he was a victim of a medical condition common to black males and had been allowed to serve as a commissioned officer without having to shave. The agreement between the plaintiff and the Memphis Police Department, Tr. Ex. 8, *supra,* was relied upon very heavily by Chief Ivy as a basis for firing the plaintiff because he allegedly said after he was not chosen for lieutenant that he did not intend to abide by the agreement. Tr. Ex. 3. Chief Ivy's Termination Letter. In *Richardson v. Quik Trip Corp., supra,* the defendant asserted equitable contract defenses of waiver and estoppel, which the court described as follows:

> Defendant [claimed] that if plaintiff accepted employment with defendant knowing of defendant's no-beard policy, knowing he was medically unable to comply with the policy, and after leading defendant's agents to believe that plaintiff could comply with the policy he [had] waived any right to object to the no-beard policy and [was] estopped from bringing this action. 591 F.Supp. at 1152.

The court rejected that defense as "meritless." This Court agrees with the reasoning of that court and determines that the same principle is applicable in this case.

As noted previously, that agreement was prepared by city officials after plaintiff was notified that he would not be considered for lieutenant because he could not shave. The agreement provided that he would be considered for the lieutenancy if he would agree to meet the grooming standards if he were selected. It is hard to see what the city gave him that he was not already entitled to, by allowing him to compete. The agreement further affirmed that he was suffering from a condition which prevented shaving and provided that the status quo would be maintained if he were not chosen as lieutenant. However, the agreement also included a proviso which was beyond the subject matter of the agreement, the plaintiff's competition for lieutenant. He was required to agree that if the Department deemed it "advisable" to reassign him, he would comply with appearance standards (shave) or his commission would be revoked. This provision is the primary basis for his firing because he was ordered to bid on a job that required shaving and fired because he refused to bid or resign his commission and take a civilian job.

The record reflects that the plaintiff very much desired to compete for the lieutenancy and that he intended to pursue electrolysis if chosen. Even though he was not chosen, he investigated the possibility of complying with the appearance standards without shaving; however, this was found not to be feasible financially nor medically. Furthermore, it was not unreasonable for the plaintiff to hope that he could persuade the high ranking officials to permit him to be a medical exception to the no-beard policy of the Memphis Police Department if he had been chosen for the lieutenant position.

Having determined that the defendant Police Department is liable under the disparate impact theory and the proof of intentional discrimination against the plaintiff as a black male due to the manipulation of high ranking officials of the Police Department, the Court must now consider the appropriate relief.

### Relief to be Granted

On September 25, 1988, less than one month before trial and approximately three years after plaintiff was discriminately fired, he was reinstated as a commissioned police officer assigned to a non-uniform position and his medical inability to shave was again acknowledged by the Department as it had been nine years previously.

The plaintiff was allowed to retain his original seniority but was not credited with seniority for the time during his wrongful break in service from November 4, 1985, to November 14, 1988. This should be remedied by crediting him with that period for seniority purposes only. The Court is not awarding him any money damages for benefits he would have received during the period other than back pay as hereinafter set forth. When the above period is credit-

ed to his seniority, his claim for reinstatement will be satisfied and rendered moot.

The plaintiff claims back pay for the entire period. The defendant does not admit liability; however, defense counsel has asserted conditional defenses to any back pay award in the event that the Court finds defendant liable. First, the defendant argues that the plaintiff failed to mitigate his damages because he did not resign his commission and take the civilian job as dispatcher when the "shotgun order" was given him to bid on a uniform position even though he could not comply with the no-beard policy or to resign his commission and take a civilian job with equivalent pay. Defense counsel argues that he could have still litigated his entitlement to a commissioned position with the Department if he had taken the "or else" job. This points up how pretextual and devious the reasons for his termination as set forth in Chief Ivy's letter of November 6, 1985, (Tr. Ex. 3), were in fact. That letter relied very heavily on the asserted reason that he had not lived up to the contract which was drawn to permit him to compete for a lieutenant position and was later asserted to be a waiver of his medical inability to shave. If he had taken the civilian job and still tried to litigate his claim for racial discrimination, he would have certainly been confronted with the contract as a waiver of his right to sue for the no-beard policy. For the above reasons, the Court rejects the claim that plaintiff failed to mitigate his damages because he refused to resign his commission and take another job.

Counsel for the defendant also argues that the plaintiff is not entilted to a back pay award because he did not use reasonable care and diligence in seeking a comparable position, in that he started his own business of selling safety supplies.

Section 706(g) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–5(g)), governs the award of back pay in Title VII cases. Its pertinent part provides:

> Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall op-

erate to reduce the back pay otherwise allowable.

Immediately after the plaintiff was fired, he drew from the Department his portion of the retirement pension in his name and went in business for himself. He sold at retail safety supplies such as equipment used by law enforcement personnel. He was prompted to do this because his brother-in-law had been successful in a similar venture; however, the plaintiff proved to be unsuited for the business. Not only did he not earn a profit, but also he ultimately filed for bankruptcy. This Court is of the opinion that the plaintiff voluntarily took himself off the type of employment for which he was trained and undertook to learn and develop a different means of livelihood, which the defendant should not be required to finance in retrospect. Until plaintiff resumed efforts to obtain employment in the field for which he had experience and training, the plaintiff was not pursuing earnings or amounts earnable with due diligence. This is a situation similar to cases wherein an employee is terminated and then becomes a full-time student. In those circumstances the student time is not includable in the back pay award. *Miller v. Marsh, Secy. of Army*, 766 F.2d 490 (11th Cir.1985); *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir.1975); *Washington v. Kroger Company*, 506 F.Supp. 1158, 1170 (W.D.Mo.1981).

In this case, the plaintiff sought employment in the field in which he had been trained by applying for employment with Federal Express Corporation in Memphis, Tennessee. His application was declined on February 23, 1987, but it was retained for six months consideration of future openings in line with his skills and interests. Tr. Ex. 5.

The Court therefore concludes that the plaintiff is entitled to back pay for the period from February 23, 1987, until November 14, 1988. The parties through their attorneys have stipulated what the plaintiff's monthly earnings would have been in 1987 and 1988. The plaintiff's back pay award is calculated as follows:

2/23/87 thru 6/30/87 @$2,005.18 per mo. = $ 8,235.53
7/1/87 thru 6/30/88 @ 2,065.35 per mo. = 24,784.20
7/1/88 thru 11/13/88 @ 2,147.96 per mo. = 8,591.84

Total Back Pay      $41,611.59

### Attorney's Fees

The Court finds that the plaintiff is the prevailing party within the meaning of 42 U.S.C. § 2000e-5(k); therefore his attorney, Richard B. Fields, is entitled to compensation for the full times and services devoted to the case. The Court, however, finds that his services should not be compensated at the rate sought by him. In the Affidavit of Richard B. Fields filed February 8, 1989, he requested that he be compensated at the rate of $175 per hour for all services for a total of 50.1 hours because he has determined that to be in accord with the rates charged for complex litigation in Memphis "with comparable experience." First, a 50.1 hour case for the entire time devoted to the case is not complex. Second, the determination by him that his new rate of $175 per hour was in accord with lawyers in Memphis (with comparable experience) is so conclusory and vague that it cannot be given authoritative weight.

Affiant also supports his $175 per hour rate with the statement that he was awarded $125 per hour for out of court and $150 per hour for trial preparation and trial service in 1986 and 1987 by this Court in *Bruhwiler v. UT*, another employment discrimination case.

The services listed in this case show that 9.7 hours were devoted to this case in 1987. Furthermore, the Court sees no justification for any increase in fees due to the passage of time or any other factors in the case.

The Court therefore concludes that Richard B. Fields is awarded attorneys fees against the City of Memphis in the total amount of $7,065.00. This is based upon

32.1 hours at $150 which are the final 7 items listed in the services performed column of the affidavit. The remaining 18 hours are to be compensated at $125 per hour.

Expenses incurred by counsel for the plaintiff are approved for payment by the defendant in the amount of $733.30 as itemized in the Affidavit of Richard B. Fields.

### Summary

The Court hereby orders that the Clerk enter a judgment in favor of the plaintiff Lee Johnson and against the City of Memphis (Memphis Police Department) in the amount of $41,611.59 as back pay, $7,065 as attorneys fees for Richard B. Fields, and $733.30 as allowable costs and expenses.